UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK ROSS, individually
and on behalf of similarly situated
persons,                                                   Civil Case No. 20-12994
                                                           Honorable Linda V. Parker

                        Plaintiff,


v.

SUBCONTRACTING CONCEPTS,
LLC, AUTO-WARES, LLC, and
JOHN DOES 1-10,

                        Defendants.
_____/

## OPINION AND ORDER (1) GRANTING DEFENDANTS' MOTIONS TO DISMISS AND COMPEL ARBITRATION (ECF NOS. 11, 12) AND (2) DENYING PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION (ECF NO. 22)

This lawsuit arises under the Fair Labor Standards Act ("FLSA"), 29 U.S.C.

§ 201, *et seq*.  On November 6, 2020, Plaintiff filed this action on behalf of himself

and similarly situated individuals alleging that Defendants misclassified him as an

independent contractor to circumvent the protections of federal and state wage

laws.  (ECF No. 1.)  Plaintiff alleges two violations of the FLSA in his Complaint:

unpaid overtime (Count 1) and unpaid minimum wage (Count II).  (*Id*.)

On January 19, 2021, Defendant Subcontracting Concepts, LLC ("SCI")

filed a "Motion to Dismiss Complaint, Compel Arbitration, and Enforce the Class

Action Waiver Provision." (ECF No. 11.)  On the same date, Defendant Auto-

Wares, LLC ("Auto-Wares") filed a "Motion to Dismiss and Compel Arbitration."

(ECF No. 12.)  The motions are based on a contract between Plaintiff and SCI.

Defendants ask the Court to dismiss this lawsuit, enforce the class action waiver,

and compel Plaintiff to arbitrate his claims as, Defendants argue, his contract with

SCI requires.  (ECF Nos. 11, 12.)  The motions are fully briefed.  (ECF Nos. 18,

20, 21.)  In addition, Defendants filed supplemental briefs in support of their

motions.  (ECF Nos. 24, 25.)

On July 26, 2021, Plaintiff filed a "Motion for Conditional Certification and

Notice Pursuant to 29 U.S.C. 216(b)".  (ECF No. 22.)  This motion is also fully

briefed.  (ECF Nos. 27, 28, 29, 30.)  On December 3, 2021, the Court conducted a

motion hearing.  At the end of the hearing, the Court indicated that supplemental

briefing was unnecessary.

## I.      Factual and Procedural Background

Plaintiff is a delivery driver, and he brings this action on behalf of himself

and other similarly situated individuals who provided delivery services for

Defendants.  (Compl. ¶¶ 9,10, ECF No. 1 at Pg ID 4.)  Plaintiff "provided last-mile

delivery services using his own automobile for Defendants in Michigan … from

June 2015 until November 2019." (Compl. ¶ 9, *Id*. at Pg ID 4.) The goods that were delivered by Plaintiff flow in interstate commerce. (Compl. ¶2, *Id*. at Pg ID 2.)

SCI provides employment services and hires individuals to perform delivery services for their customers and contracts with Auto-Wares and other Doe Defendants. (Compl. ¶¶ 11, 18, 19, *Id*. at Pg ID 4,6.) Auto-Wares "operates multiple warehouses and shops throughout the state of Michigan, including but not limited to Maxi Automotive ('Maxi'), from which it uses Plaintiff and other collective members to deliver automobile parts." (Compl. ¶ 12, *Id*. at Pg ID 5.) "SCI is in charge of job site assignment, whether those job sites be with Defendant Auto-Wares or with another Doe delivery company." (Compl. ¶ 41, *Id*. at Pg ID 9.) SCI is also responsible for recruitment, background checks, payroll, and tracking the location of delivery drivers throughout the day via a smartphone web application. (Compl. ¶¶ 20, 21, 22, 23, *Id*. at Pg ID 6-7.) "SCI is in charge of job site assignment, whether those job sites be with Defendant Auto-Wares or with another Doe delivery company." (Compl. ¶ 41, *Id*. at Pg ID 9.) Plaintiff alleges that "Defendants Does 1-10 … who operate as joint employers with Defendant SCI, form a single enterprise and/or constitute joint employers." (Compl. ¶ 13, *Id*. at Pg ID 5.)

The Complaint defines the proposed collective class as "[a]ll individuals who contracted with SCI as last-mile delivery drivers using their own personal vehicles in the United States from three years prior to the filing of this Action who were classified as independent contractors ('the FLSA Collective')." (Compl. ¶ 16, *Id*. at Pg ID 6.) According to Plaintiff, "Defendants are aware that Plaintiff and collective members work overtime but fail to pay an overtime premium for hours over 40." (Compl. ¶ 30, *Id*. at Pg ID 8.) Plaintiff also alleges that Defendants have misclassified him and other similarly situated individuals as independent contractors, which has resulted in overtime pay and minimum wage violations. (Compl. ¶¶ 32-44, 45-61, *Id*. at Pg ID 8-13.)

In lieu of an answer, Defendants filed the motions presently before the Court. (ECF Nos. 11,12.) Attached to SCI's motion is the "Owner/Operator Agreement" ("Agreement") between Plaintiff and SCI. (ECF No. 11-2 Pg ID 86-93.) In relevant part, the Agreement reads as follows:

**TWENTY-SIXTH:** ARBITRATION

    In the event of any dispute, claim, question, or disagreement arising from or relating to this agreement or the breach thereof, or service arrangement between Owner / Operator and SCI's clients, the parties hereto shall use their best efforts to settle the dispute, claim, question, or disagreement. To this effect, the parties shall consult and negotiate with one another in good faith, in an attempt to reach a just and equitable solution, satisfactory to both parties. If resolution of the dispute, claim, question, or disagreement is not reached within a period of 60 days, then upon notice by either party, disputes that are

4

within the jurisdictional maximum for small claims will be settled in the small claims court where the Owner / Operator resides.

All other disputes, claims, questions, or differences beyond the jurisdictional maximum for small claims courts within the locality of the Owner / Operator's residence shall be finally settled by arbitration in accordance with the *Federal Arbitration Act.*

Neither you nor SCI shall be entitled to join or consolidate claims in arbitration by or against other individuals or entities, or arbitrate any claim as a representative member of a class or in a private attorney general capacity.

(ECF No. 11-2 at Pg ID 89-90 (emphasis added).)  The Agreement has a New York choice of law provision and a severability clause.  (*Id.* at Pg ID 89.)  The Agreement also contains the following language directly above the signature block: "THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION AND CLASS-ACTION WAIVER WHICH AFFECTS YOUR LEGAL RIGHTS AND MAY BE ENFORCED BY THE PARTIES."  (*Id.* at Pg ID 90.)  Plaintiff signed the Agreement and initialed each page on June 1, 2015. (*Id.* at Pg ID 86-90.)  Plaintiff does not dispute that he signed the Agreement.  (*See* ECF No. 18 at Pg ID 271.)

## II.    Applicable Law and Analysis

The Federal Arbitration Act (FAA), 9 U.S.C. § 2, provides:

A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform

> the whole or any part thereof, or an agreement in writing to submit to
> arbitration an existing controversy arising out of such a contract,
> transaction, or refusal, shall be valid, irrevocable, and enforceable.

The FAA reflects "both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted). Under the FAA, a written agreement to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. When considering a motion to compel arbitration under the FAA, the court has four tasks: (1) to determine whether the parties agreed to arbitrate; (2) to determine the scope of any agreement to arbitrate; (3) if federal statutory claims are asserted, decide whether Congress intended those claims to be nonarbitrable; and (4) if some of the claims fall outside the scope of the arbitration agreement, decide whether to stay the remaining proceedings pending arbitration. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000).

Regarding the second factor, the Agreement covers "any dispute, claim, question, or disagreement arising from or relating to this agreement or the breach thereof, or service arrangement between Owner/Operator and SCI's clients…." (ECF No. 11-2 at Pg ID 89-90.) As such, Plaintiff's claims fall within the scope of

the arbitration clause of the Agreement. Thus, the Court will now turn to the remaining issues.

### A. Whether the Parties Agreed to Arbitrate

It is undisputed that the Agreement is between SCI and Plaintiff, but the remaining question is whether Auto-Wares, as a non-signatory to the Agreement, may invoke the arbitration clause. Auto-Wares argues that New York law governs the Agreement and that "[u]nder New York law, a non-signatory to an arbitration agreement may compel a signatory to abide by that agreement and arbitrate a dispute." (ECF No. 12 at Pg ID 235-36.) Plaintiff does not address the issue or argue otherwise in its briefing.[1] District courts in the Second Circuit "have formulated a two-part intertwined-ness test, under which they examine whether: (1) the signatory's claims arise under the subject matter of the underlying agreement, and (2) whether there is a close relationship between the signatory and the non-signatory party." *Moss v. BMO Harris Bank*, N.A., 24 F. Supp. 3d 281, 287–88

---

[1] At the motion hearing, Plaintiff argues that the Sixth Circuit ruling in *AtriCure, Inc. v. Meng*, 12 F.4th 516 (6th Cir. 2021), applies and overrules *Southerland v. Corp. Transit of Am.*, No. 13-14462, 2014 WL 4906891, at *11 (E.D. Mich. Sept. 30, 2014). However, *AtriCure, Inc*. applies Ohio law, not Michigan or New York law, and the facts are distinguishable. The *AtriCure* court analyzed two theories of "equitable estoppel" under Ohio law, finding that the first theory failed because plaintiff's tort claims against nonparties did not seek to enforce duties under the contract, and concluding that the nonparties could not force plaintiff to arbitrate its torts claims. *Id*. at 528. In other words, the court found that the claims were not intertwined. The second theory failed because nonparty defendants failed to raise the issue at the district court and therefore forfeited it. *Id*. at 531.

(E.D.N.Y. 2014) (internal citations and quotation marks omitted); *see also In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 480 (S.D.N.Y. 2013) (finding that defendants made the necessary showing for equitable estoppel when parties were aware by signing the agreement that they were entering into a relationship with the non-signatories).  A court in this district found that "[u]nder both New York and Michigan law, a non-signatory to an arbitration agreement may compel a signatory to abide by that agreement and arbitrate a dispute."  *Southerland v. Corp. Transit of Am.*, Case No. 13-14462, 2014 WL 4906891, 2014 WL 4906891 at 41(E.D. Mich. Sept. 30, 2014).  In *Southerland*, the plaintiffs were delivery drivers who signed, as here, an Owner/Operator Agreement with SCI.  *Id.* at *1.  A non-signatory logistics broker filed a motion to compel arbitration based on the agreement and the court granted the motion.  *Id.*  The court relied on the undisputed fact that the logistics broker and SCI were closely related, that the plaintiffs foresaw the involvement of a logistics broker in their relationship with SCI, and finally that "most, if not all, of the issues raised by the plaintiff . . . are explicitly addressed by the SCI Agreement."  *Id.* at 5.  The Court finds the same here.  Accordingly, Auto-Wares may invoke the arbitration clause of the Agreement.

### B. Congressional Intent to Make Claims Nonarbitrable

8

As to the third factor, Plaintiff alleges federal statutory claims of violations of FLSA.  (Compl. ¶¶ 68-94, ECF No. 1 at Pg ID 15-20.)  Congress did not intend FLSA claims to be nonarbitrable.  *Floss v. Ryan's Fam. Steak Houses, Inc.*, 211 F.3d 306, 313 (6th Cir. 2000).

However, Plaintiff argues that Congress intended for his claims to be non-arbitrable because Plaintiff and similarly situated individuals are exempt transportation worker under § 1 of the FAA.  (ECF No. 18 at Pg ID 271.)  Despite the liberal policy in favor of arbitration and the broad scope of § 2 of the FAA, the FAA excludes from coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."  9 U.S.C. § 1.  The United States Supreme Court recently discussed the FAA's exclusion for "contracts of employment" of certain transportation workers in *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, (2019).  In that case, an independent contractor working for an interstate trucking company initiated a class action labor lawsuit in federal court against his employer.  *Id*. at 536.  The Supreme Court reached two holdings regarding the exclusion: (1) a court should decide whether the exclusion applies; and (2) it applies to employer-employee contracts and contracts involving independent contractors.  *Id.* at 537, 539.  In doing so, the Court deferred to the exclusion over language in the contract, noting that "[t]he parties' private agreement may be crystal clear and require arbitration of

9

every question under the sun, but that does not necessarily mean the Act authorizes a court to stay litigation and send the parties to an arbitral forum." *Id.* at 537-38.

To decide whether the exclusion in § 1 of the FAA applies, a court must determine whether the subject contract is 1) a "contract of employment"; *and* 2) whether "workers are engaged in … interstate commerce". *New Prime* holds "contracts of employment" include agreements between independent contractors. *Id.* at 538-39. Further, "[w]hen Congress enacted the Arbitration Act in 1925, the term 'contracts of employment' referred to agreements to perform work." *Id.* at 543-44. SCI argues that it and Plaintiff were not engaged in a contract of employment and that "*New Prime* does *not* stand for the proposition that *all* independent contractors fall within the Section 1 exemption of the FAA."[2] (ECF No. 11 at Pg ID 70 (emphasis in original) (citing *New Prime*, 139 S. Ct. at 538).) Plaintiff argues that the inquiry into whether the exemption in § 1 of the FAA

_____

[2] SCI provides no authority to support their argument that the Agreement with Plaintiff is not a "contract of employment" as found in *New Prime*. (*See* ECF No. 11, 20.) Plaintiff's Agreement with SCI explains that SCI is a third-party administrator that procures, qualifies, and supports drivers. (ECF No. 11-3 at Pg ID 99.) Further, Plaintiff signed an "Independent Contractor Acknowledgment Form" with SCI. (*Id.* at Pg ID 257.) However, at least one federal court has found that where a delivery driver contracted with a company to work as an independent contractor and also contracted with a third-party payroll company, that the agreement with the third-party payroll company was not to perform work or a contract of employment under § 1 of the FAA. *Cuneo v. Nat'l Delivery Sys., Inc.*, No. 20-P-1408, 2021 WL 5238716, at *3 (Mass. App. Ct. Nov. 5, 2021). Similarly here, SCI argues that it is a third-party payroll company and the work Plaintiff performed was not for SCI.

applies ends with the finding in *New Prime* that a contract of employment includes agreements between independent contractors and the FAA governs the Agreement. The Court need not reach a conclusion as to whether the Agreement is a contract of employment, as Plaintiff fails to establish that the putative class is comprised of "workers engaged in commerce."

Auto-Wares argues that Plaintiff is not engaged in work that is clearly involved in interstate commerce.  (ECF No. 12. at Pg ID 240.)  *New Prime* does not aid the Court in the resolution of this issue as there was no dispute that the plaintiff was engaged in interstate commerce.  *See New Prime*, 139 S. Ct. at 539. Plaintiff bears the burden of proving that the exclusion applies here.  *See, e.g*., *Lee v. Postmates Inc.*, No. 18-03421, 2018 WL 6605659, at *7 (N.D. Cal. Dec. 17, 2018).

To begin, Supreme Court and Sixth Circuit caselaw instruct that the exclusion in § 1 of the FAA should be interpreted narrowly.  In *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001), the Supreme Court provided that the phrase "engaged in commerce" as used in § 1 means something narrower than "affecting commerce" or "involving commerce" as used in § 2 of the FAA.  *Id.* at 115. Similarly, in *Asplundh Tree Expert Co. v. Bates*, 71 F.3d 592 (6th Cir. 1995), the Sixth Circuit concluded that "the exclusionary clause of § 1 of the Act should be narrowly construed to apply to employment contracts of seamen, railroad workers,

and any other class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are." *Id.* at 600-01.

The Sixth Circuit briefly addressed the proper interpretation of the § 1 exemption in a case involving a United States Postal Worker. *Bacashihua v. U.S. Postal Serv.*, 859 F.2d 402 (6th Cir. 1988). In *Bacashihua*, the plaintiff was employed as a parcel post distributor at the Bulk Mail Center in Michigan. *Id.* at 403. The court noted that it "seems clear" that the plaintiff was in a class of workers engaged in interstate commerce and disagreed with the district court's finding that the plaintiff was "not *personally* engaged in interstate commerce . . . ." *Id.* at 405 (emphasis in original). The court stated that the focus of concern should be on whether "the class of workers to which the complaining worker belonged engaged in interstate commerce." *Id.* The court noted that postal workers as a class "are responsible for dozens, if not hundreds, of items of mail moving in 'interstate commerce' on a daily basis. Indeed, without them, 'interstate commerce,' as we know it today, would scarcely be possible." *Id.* (quoting *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 823 F.2d 466, 473 (11th Cir. 1987)). The Sixth Circuit found that "[i]f any class of workers is engaged in interstate commerce, it is postal workers." *Id.* More recently, other circuits have

12

addressed the exclusion with respect to workers in positions more analogous to Plaintiff's position.

The First and Ninth Circuits held that "last-mile" delivery drivers who are part of continuous interstate transportation are exempt under the FAA. *See Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 13 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 2794 (2021); *Rittman v. Amazon.com, Inc.* 971 F.3d 904 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1374 (2021). In *Waithaka* the plaintiff was a worker for Amazon Logistics which "provides package delivery services 'through the last mile of the order.'" *Id.* at 14. The packages are purchased by consumers from Amazon as "one of the world's largest online retailers….'" *Id.* In concluding that the exclusion for interstate transportation workers applied, the First Circuit reasoned that "a worker transporting goods that had come from out of state or that were destined for out-of-state locations was 'engaged in interstate commerce,' even if the worker's role in transporting the goods occurred entirely within a single state.'" *Id*. at 20. The court also reasoned that "[t]he nature of the business for which a class of workers perform their activities must inform [the] assessment." *Id*. at 22.

The Ninth Circuit reached the same conclusion in *Rittman*. There, the plaintiff and the putative class members worked for an application-based package delivery program called Amazon Flex ("AmFlex"), which allowed employees to

13

transport packages for the last leg of the shipment to their destination.  *Rittman,*

971 F.3d at 915. The program worked as follows:

> Historically, Amazon has shipped products by using large third-party delivery providers such as FedEx and UPS. Recently, it has *supplemented those delivery services* by contracting with local delivery providers through its AmFlex program…. In the AmFlex program, Amazon contracts with individuals to make "last mile" deliveries of products from Amazon warehouses to the products' destinations using the AmFlex smart phone application. AmFlex participants use a personal vehicle or bicycle, or public transportation, to deliver products ordered through the Amazon website or mobile applications. They pick up assigned packages from an Amazon warehouse and drive an assigned route to deliver the packages.

*Id*. at 907 (emphasis added).  Essentially, Amazon and AmFlex stepped in the

shoes of traditional mail delivery providers such as FedEx and UPS.  The AmFlex

program and associated drivers worked as a subsidiary business of Amazon.  *Id*.

The Ninth Circuit concluded that AmFlex workers were engaged in

interstate commerce "even if they do not cross state lines to make their deliveries."

*Id*. at 919.  The court also held the nature of the business must inform the analysis.

*Id*. at 917 (quoting *Waithaka*, 966 F.3d at 19).  The court noted that "Amazon is

'one of the world's largest online retailers' that 'work[s] closely with freight and

transport companies on a massive scale to ensure that every individual shipment

gets where it needs to go.'"  *Id*. at 915.  As the court explained, Amazon's business

"includes not just the selling of goods, but also the delivery of those goods,

typically undertaken by those businesses we have considered to be engaged in

14

foreign and interstate commerce, e.g., FedEx and UPS." *Id*. at 918; *see also*

*Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 593-94 (3d Cir. 2004) (holding

that a field service supervisor for a package transportation and delivery company

that engages in intrastate, interstate, and international *shipping* was exempt under

§1.); *Ward v. Express Messenger Sys., Inc.*, 413 F. Supp. 3d 1079, 1086–87 (D.

Colo. 2019) (holding that a business that provided regional same-day and

overnight package delivery services for customers such as Amazon, Staples, and

various pharmaceutical companies was exempt under § 1 of the FAA.)  The

*Rittman* court reasoned that "[w]ere Amazon to use a proprietary ship fleet or rail

system to accomplish the same goals, those workers would be subject to the

exemption." *Rittman*, 971 F.3d at 918.  The means Amazon employs to get

products to customers is different from traditional transportation and mail carriers,

but it essentially accomplishes the same goal of shipping products across the

country.  It follows, the Ninth Circuit reasoned, that the AmFlex workers'

"transportation of goods wholly within a state are still a part of a continuous

interstate transportation, and those drivers are engaged in interstate commerce for §

1's purposes." *Id*. at 916.

> The *Rittman* court further reasoned:
>
>> Amazon packages do not 'come to rest,' at Amazon
>> warehouses, and thus the interstate transactions do not conclude
>> at those warehouses. The packages are not held at warehouses
>> for later sales to local retailers; they are simply part of a process

> by which a delivery provider transfers the packages to a different vehicle for the last mile of the packages' interstate journeys. The interstate transactions between Amazon and the customer do not conclude until the packages reach their intended destinations, and thus AmFlex drivers are engaged in the movement of interstate commerce.

*Id*. at 916.

The Seventh Circuit and district courts across the country have found delivery drivers working in other industries not exempt.  In *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 803 (7th Cir. 2020), the court held that food-delivery drivers for an online restaurant-food delivery service do not fall within the class of transportation workers exempted under § 1 of the FAA.  *Id.* at 803.  The Seventh Circuit reasoned:

> A package of potato chips, for instance, may travel across several states before landing in a meal prepared by a local restaurant and delivered by a … driver; likewise, a piece of dessert chocolate may have traveled all the way from Switzerland. The plaintiffs insist that delivering such goods brings their contracts with [defendant] within § 1 of the FAA. As they see it, the residual exemption is not so much about what the worker does as about where the goods have been.

> But to fall within the exemption, the workers must be connected not simply to the goods, but to the act of moving those goods across state or national borders. Put differently, a class of workers must themselves be 'engaged *in the channels* of foreign or interstate commerce.'

*Id.* at 802 (emphasis in original) (citing *McWilliams v. Logicon, Inc.*, 143 F.3d 573, 576 (10th Cir. 1998).)  The court stated that the "inquiry is always focused on the

worker's active engagement in the enterprise of moving goods across interstate

lines."  *Id.*  The court explained that a transportation worker is someone "who

performs work analogous to that of seamen and railroad employees, whose

occupations are centered on the transport of goods in interstate or foreign

commerce."  *Id.*

The *Wallace* court cautioned that construing § 1 too liberally could lead to

finding occupations exempted from FAA coverage which have nothing to do with

interstate commerce, such as "dry cleaners who deliver pressed shirts

manufactured in Taiwan and ice cream truck drivers selling treats made with milk

from an out-of-state dairy . . . ."  *Id*. at 802.  Similarly, other courts have found

delivery workers not actively engaged with interstate commerce not exempt from

FAA coverage.  *See, e.g.*, *O'Shea v. Maplebear Inc.*, 508 F. Supp. 3d 279, 289

(N.D. Ill. 2020) (holding that workers for online grocery shopping service were not

exempt as they were merely connected to goods by way of delivery, in that

interstate movement was not a central part of their job descriptions); *Bean v. ES

Partners, Inc.*, 533 F. Supp. 3d 1226, 1236 (S.D. Fla. 2021) (finding worker for a

prescription medication courier service which received medication from interstate

carriers not exempt); *Young v. Shipt, Inc.*, No. 1:20-CV-05858, 2021 WL 4439398,

at *3 (N.D. Ill. Sept. 27, 2021) (holding that there was a break in the channels of

commerce when workers delivered goods, presumably from other states, which

had already arrived at a local retail store to consumers); *Lee*, 2018 WL 4961802, at

*8 (holding that courier was not exempt when delivering food and other

merchandise goods from local merchants to local customers).  The Eleventh

Circuit remanded a case to the district court to determine whether the exemption

applied but noted that exemption based on drivers transporting items which have

previously been transported interstate was not sufficient.  *Hamrick v. Partsfleet,

LLC*, 1 F.4th 1337, 1347 (11th Cir. 2021).

This Court finds Plaintiff's work to be more similar to the workers in cases

discussed immediately above and distinguishable from the workers in *Rittman* and

*Waithaka*.  There is a distinction between businesses where drivers deliver goods

"destined for out-of-state locations" and businesses where items have already made

their interstate journey and then are purchased by consumers from a local retailer.

*See Waithaka*, 966 F.3d at 20.  At the motion hearing, Defendant Auto-Wares

explained that interstate and local manufacturers of auto-parts transport their

products to a Michigan warehouse Auto-Wares owns.  Auto-Wares explains that

this is the end of the interstate journey because Auto-Wares is the customer, and a

retail consumer has not yet purchased the product.  Auto-Wares' drivers then

transfer these products to an Auto-Wares retail store.  The products sit at the local

Auto-Wares retail store until purchased by local consumers, and then Plaintiff or

similarly situated individuals execute the delivery.  *See Lee v. Postmates Inc.*, 2018

WL 6605659, at *7(noting "[i]tems purchased by local customers from local merchants are not 'goods that travel interstate' within the meaning of the test … and even if they were, this factor alone would not carry the court's conclusion on the issue of interstate commerce.") (internal citation omitted).  The instant facts are similar to the application-based delivery services of the aforementioned cases finding the delivery drivers not exempt.  *See Young*, 2021 WL 4439398, at *4 (observing "unlike online retailers such as Amazon, [s]hoppers only deliver goods *after* they already have arrived at the local retail store and only *after* a customer initiates a purchase from the retail store.") (emphasis in original).  Plaintiff was only responsible for delivering orders after Auto-Wares' customers ordered the auto-parts.  Further, Auto-Wares explained that while products came from out of state, they had not been purchased at the time of arrival at the warehouse but would instead come to rest until ordered by a customer.  *But cf. Edmond Carmona v. Dominos Pizza LLC*, No. SACV2001905JVSJDEX, 2020 WL 7979174, at *4 (C.D. Cal. Dec. 9, 2020) (finding when a delivery driver delivered pizza products that Dominoes owned, which had come from out of state, from a supply chain center to local franchisees, that they had helped facilitate the movement of these products to their final destination.)  While, Plaintiff is indeed a delivery driver, he does not perform last-mile services.  For these reasons, the Court holds that Plaintiff and putative class members are not interstate transportation workers

exempt from arbitration under § 1 of the FAA.[3]  As such, the arbitration agreement

is valid and enforceable.

### C. Whether the Court is required to stay the remaining proceedings pending arbitration

Upon concluding that the plaintiff's claims are subject to arbitration, a

district court may dismiss the action or, if requested by a party, stay the action.

The FAA, provides that:

> If any suit or proceeding be brought in any of the courts of the
> United States upon any issue referable to arbitration under an
> agreement in writing for such arbitration, the court in which
> such suit is pending, upon being satisfied that the issue involved
> in such suit or proceeding is referable to arbitration under such
> an agreement, shall on application of one of the parties stay the

---

[3] SCI argues that even if the Court were to hold that Plaintiff is exempt under the FAA, "Plaintiff's claims are still subject to mandatory arbitration under New York arbitration law, the choice of law designated in the Agreement." (ECF No. 11 at Pg ID 72-74.)  New York courts have found that an arbitration agreement with SCI, may proceed under New York law, even if a § 1 exemption applies.  *Espinosa v. SNAP Logistics Corp.,* No. 17 CIV. 6383 (AT), 2018 WL 9563311, at *4 (S.D.N.Y. Apr. 3, 2018) (citing cases).  The *Espinosa* court noted that the language in the SCI arbitration agreement of "in accordance with the FAA" did not make the agreement unenforceable under New York law.  *Espinosa,* 2018 WL 9563311, at *5 n.3.  The same language is found in the arbitration clause of the subject Agreement.  SCI also argues that it has met all the factors required to enforce an arbitration agreement under New York law, including complying with the Agreement's notice provision in the arbitration clause on January 6, 2021. (ECF No. 11 at Pg ID 72-73 (citing *Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 524, 530 (S.D.N.Y. 2003)); (ECF No. 11-3.)  Plaintiff does not address the factors in its response.  (*See* ECF No. 18.)  However, at the hearing, Plaintiff argues that he chose to opt-out of arbitration under paragraph 16 of an Independent Contractor Acknowledgment Form.  (*See* ECF No. 11-2 at Pg ID 93.)  Plaintiff's argument is not persuasive as he has offered no evidence of a valid opt-out after SCI provided notice of its intention to invoke the arbitration agreement on January 6, 2021.

> trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  The Court has found that all of Plaintiff's FLSA claims are referrable to arbitration.  SCI argues that the case should therefore be dismissed. (ECF No. 11 at Pg ID 78-79 (citing Ozormoor v. T-Mobile USA, Inc., 354 F. App'x 972, 975 (6th Cir. 2009).)  Auto-Wares requests if the Court is not inclined to dismiss the Complaint, that it stay proceedings pending resolution of the arbitration.  (ECF No. 12 at Pg ID 223.)  Plaintiff does not argue that the claims are not within the scope of the Agreement or request that this Court stay the action.[4] "Given [this Court's] ruling that all issues raised in this action are arbitrable and must be submitted to arbitration, retaining jurisdiction and staying the action will serve no purpose."  *Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000).

The Court further holds that the Agreement contains a valid class action waiver, providing that neither Plaintiff nor SCI "shall be entitled to join or consolidate claims in arbitration by or against other individuals or entities, or arbitrate any claim as a representative member of a class or in a private attorney general capacity.  (ECF No. 11-2 at Pg ID 90.)  Accordingly, the Court denies

---

[4] The Court finds that the holding in *Arabian Motors Grp. W.L.L. v. Ford Motor Co.*, No. 20-2112, 2021 WL 5755304 (6th Cir. Dec. 3, 2021) is inapplicable to the facts herein.  Here, no party has moved to stay the action.

Plaintiff's "Motion for Conditional Certification and Notice Pursuant to 29 U.S.C. § 216(b)." (ECF No. 22). The Sixth Circuit has ruled that "employees who do not sign individual arbitration agreements are free to sue collectively, and those who do sign individual arbitration agreements are not." *Gaffers v. Kelly Servs., Inc.*, 900 F.3d 293, 296 (6th Cir. 2018) (citing *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018).)

Accordingly,

**IT IS ORDERED** that Defendants' motions to dismiss and compel arbitration (ECF Nos. 11,12) are **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Conditional Certification (ECF No. 22) is **DENIED**.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: December 23, 2021